**THE EMMY.**

District Court, S. D. New York.
Jan. 28, 1944.

Paul C. Matthews, of New York City (Archibald F. McGrath, of New York City, of counsel), for libellant.

Reid, Cunningham & Freehill, of New York City (Frederick H. Cunningham, of New York City, of counsel), for respondents.

LEIBELL, District Judge.

Libellant, Peter Gambera, brought this action against the S. S. "Emmy" and her owner (Andrew Bergoty, also known as Andreas Vergottis) for personal injuries suffered by libellant when he fell through an unprotected open hatch, in the tween decks coal bunker section of the ship, on the morning of December 23, 1939. At the time of the accident he was employed as a fireman and he had been sent to wheelbarrow and shovel some coal from the tween decks bunker to a chute emptying into the fireroom. The tween decks section was dark with only a single light at one end and as the libellant walked slowly towards the light he fell through the open hatch sustaining serious injuries. There is no question about the accident and that some of the injuries received were permanent, but respondent argues that libellant was not a member of the ship's crew at the time; that he had not been sent to the mezzanine bunker for coal, and finally that he is a native born Italian and the Jones Act does not cover his case. The respondent has pleaded a Greek statute, a workmen's compensation act, and contends that since the S. S. "Emmy" sailed under the Greek flag and was owned by Greeks, libellant is limited to the relief provided by the Greek statute.

I permitted the respondent to make a complete record on this point as to the

Greek law, although I believe that the question has been passed upon by our own *Circuit Court of Appeals* in this very case (Gambera v. Bergoty, 2 Cir., 132 F.2d 414, 415), holding that Section 33 of the Jones Act, Sec. 688, title 46 U.S.C.A., covers the libellant's claim as a seaman. The libel in rem was dismissed but the claim in personam was ordered tried on the merits.

Libellant was born in Genova, Italy, in 1903. He came to this country in 1920, paying a poll tax on his admission at the Port of New York. He has been a seaman most of the time since 1922, although he has also done scaling work aboard ship, as well as stevedoring. For part of the year 1927 he worked in the mines in Pennsylvania and for one year, 1927 to 1928, he was in the United States Army, receiving an honorable discharge therefrom. Libellant's work aboard ship has been mainly as a coal passer or fireman. He holds a certificate of rating as a wiper from the United States Department of Commerce issued February 6, 1937. In August 1937 he took out his "first papers" of naturalization.

The fact that the vessel was registered in Greece and flew the Greek flag and is owned by Greeks does not relieve respondent owner from liability in an action in personam under the Jones Act on the facts herein described. The facts developed at the trial are the same as those stated in the following quotation from the opinion of the Circuit Court of Appeals:

"Not only had the libellant been domiciled in the United States for over twenty years, during the greater part of which he had served on American ships, but the voyage began and ended in the United States; it was from Trenton to Philadelphia, Norfolk and New York, and he was injured on the leg between Trenton and Philadelphia. The whole voyage was thus to be performed within our territorial waters except possibly for a part of the leg between Norfolk and New York."

That Court disposed of the respondents' contention as follows:

"To hold that men who in every other but this formal sense have since boyhood been members of our own community, and who earn their living side by side with those on behalf of whom the act was indubitably passed; to hold that these are excepted from its protection because they have not become naturalized, would, it seems to us, pretty clearly defeat the overriding purpose of Congress."

I shall now discuss the merits—the question of respondents' negligence and any contributory negligence on the part of the libellant. There is no doubt in my mind that libellant had been hired and was actually employed as a fireman aboard the ship at the time of the accident. It appears from the testimony that on December 20th one, Nick Cavallos, acting for the ship, hired a number of men in Philadelphia, about seven to go to Trenton where the S. S. "Emmy" was at dock and to clean the residue of a china clay cargo from the holds of the ship. Cavallos told the libellant that after the cleaning job was finished, he would be one of the firemen; a job for which he was qualified and for which he held a certificate. The group of men left Philadelphia, early on the morning of the 21st and worked all of the morning of the 21st and the 22nd cleaning out the ship. They slept on board both nights. On December 21st the captain took the names of some of the men who were to act as firemen on the trip from Trenton to Philadelphia, Norfolk and New York. Libellant was one of those men.

Early in the morning of December 23rd one of the officers came to the forecastle for two men to act as firemen on the trip from Trenton to Philadelphia. Libellant and a man named Gioelli went down to the fireroom. The engineer told libellant to help get up steam and libellant started to break the fires which had been banked. At that time one of the few regular Greek firemen remaining on the ship came into the fireroom and an argument developed between Gioelli and the Greek, with the result that Gioelli went upstairs on deck and thereafter assisted in handling some of the cables and ropes of the ship. Libellant continued his work in the fireroom.

Between 9 and 10 o'clock the engineer directed libellant to go up in the bunker tween decks and to shovel some coal down through the chute, which emptied into the fireroom. The dynamos on the ship were not in operation. There were no electric lights. Such lighting as there was consisted of some open lamps, without glass globes, the light being furnished by a wick about an inch long. These lamps had hook-shaped handles, arranged so that they could be hung at any convenient place. When libellant was directed to go up to the tween decks bunker and get some coal

down, he attempted to take a lamp from the fireroom and he was told to leave it where it was, that there was a light in the tween decks bunker. It appears from the testimony that the ship had very little coal aboard. There were only some sweepings and dust in the main bunker, which opened off the floor of the fireroom. In fact the coal supply was so limited that when the ship was four days off the American coast the engineer "Reported to the Captain that he was afraid we did not have enough coal to reach America". So there are these physical facts to support libellant's story that he was sent up to the tween decks bunker to wheelbarrow and shovel some coal over to the chute.

Libellant ascended a narrow steel stairway from the fireroom to a cross walk. He then opened a door off the cross walk and looked in the tween decks bunker on the port side. There was no light there, so he did not enter but went over to a door on the starboard side and entered the tween decks bunker on the starboard side. He saw an oil lamp hanging from some part of the wall, at a distance of about 40 feet. The lamp did not light up the space within in the mezzanine bunker. Libellant wanted to get the lamp to help him locate a shovel and a wheelbarrow. As he was walking slowly in the direction of the lamp with his left hand extended in front of him at about the height of his head, he fell through an open hatch a distance of 22 feet to the flooring of the main coal bunker and was badly hurt.

It appears from the testimony that when they put coal aboard this ship the tween decks bunker is partitioned off from the rest of the tween decks by a heavy board partition covered with oil cloth. The arrangement of this bunker, with an open hatch over the main coal bunker immediately beneath it, permits them to fill the main bunker with coal and then the tween decks reserve above it. As the coal is used in the fireroom from the main coal bunker the supply of coal piled in the tween decks will work its way by force of gravity, for a certain distance around the hatch, down through the open hatch to the main bunker.

When libellant went to the tween decks bunker, not only was the main coal bunker empty but most of the coal in the tween decks bunker had been used. There was some loose coal on the flooring over which he walked towards the light. The officers of the ship testified that the hatch cover in the tween decks bunker was made of metal and that it fitted on a coaming of the hatch, which was about a foot high, and that it could be bolted to the coaming. The officers also testified that after the coal through the open hatch had slid down into the main bunker it was not their practice to put the metal cover back on the open hatch because it was too much work. There were no stanchions, ropes or other protection around the coaming of the open hatch. Libellant had not been warned that there was an open hatch in the tween decks bunker. He did not know it was open. It was his first visit to that part of the ship. He had been denied the use of the lamp in going there and the lamp that was in the tween decks coal bunker was so far away from the open hatch that it failed to light up that part of the·bunker floor and make it visible to any one walking therein. As the libellant walked slowly towards the light in the bunker he felt some coal underneath his feet. The next thing he remembers is that he was falling through the air. When he came to some time later he was on the flooring of the main bunker off the fireroom.

■ Respondent submits the depositions of the Captain and the Chief Officer to refute the testimony of libellant and the witnesses produced by libellant to the effect that he had been hired as a fireman. I am satisfied that he was so engaged. One of the exhibits submitted by libellant's attorney is a certified copy of the record in the United States District Court for the Eastern District of New Jersey which shows that a number of the crew, including seven firemen, had filed a libel against the ship on December 26th for unpaid wages and bonuses, in which they stated that they had left the service of the ship on December 19th. Respondent offered the ship's articles for the purpose of showing that the libellant had not been engaged as a member of the ship's crew. However, the ship's articles were prepared before the vessel sailed from England for America. Other records of the Master showed that a number of the crew, including at least seven firemen, had been paid off in New York on December 19, 1939, that the only workmen of the fireroom still on the ship's roster were two coal passers and one fireman. It was to fill some of these vacancies in that part of the crew that three of the men hired by Cavallos, two of them being libellant and the witness, Gioelli, had been engaged with

the understanding that they would act as firemen after they had completed their job of cleaning out the hold of the ship. According to the Captain's own testimony he hired three firemen after the ship reached Philadelphia. There is no question but that this ship was undermanned. Libellant's testimony that he was engaged by the Captain to act as a fireman on the first day he went aboard ship and that he was directed early in the morning of December 23rd to report to the engineroom is supported by the exhibits hereinabove referred to.

Respondent was confronted with the problem of accounting for the fact that libellant had been found injured lying on the floor of the main bunker. How did he get here? Admittedly only one way, by falling through the open hatch of the tween decks bunker above. How did he happen to be in the tween decks coal bunker, unless he went there for the purpose to which he testified? The respondent's attorney stated that his theory was that the libellant was trying to avoid serving that morning for an extra hour of work cleaning out part of hold No. 2 and went into the tween decks hatch where he would not be seen. But the tween decks hold No. 2 was separated from the tween decks coal bunker by a strong wooden partition covered with oil cloth. In order to have libellant at a place where he could fall through this hatch respondent had to account for his passing through this partition. There were some statements in the depositions submitted by respondent that some of the boards of this partition were loose at a point where they were nailed and could be pulled apart so as to permit a person to pass through. That is contradicted by other depositions of respondents' witnesses.

The donkeyman testified in his deposition that this wooden bulkhead "is permanent, but we open it when we are taking coal, and when we are not taking coal we close it and it stays closed". Melamis, the Chief Engineer, in his deposition testified that there was a partition which separated the tween decks just forward of the bunker hatch from the tween decks just along side the No. 2 hold, at the tween decks level, that this partition was made "out of wood and oil cloth, strong, heavy", that there was no door leading through the partition and "there is no way of going through". I believe that to be the fact.

I am satisfied that there was no way in which the libellant could have passed through the partition that separates hold No. 2 from this coal bunker, on the tween decks level. These physical facts confirm the libellant's story as to how he happened to be in the tween decks bunker and supports his statement that he was there as a member of the crew of the ship, as a fireman engaged by the Captain and directed by one of the engineers to go to the tween decks bunker and send some coal down through the chute of the reserve bunker. Libellant's testimony that he was hired as a fireman is supported also by the testimony of Gioelli, who went with him as a fireman to the fireroom on the morning of the 23rd; by Edward Macdande, who was one of the group hired in Philadelphia to go to Trenton to clean out the holds of the ship, and by Joseph Skocaj, who was in the forecastle on the morning of the 23rd at the time a man called for the firemen and Gioelli and libellant left the forecastle in response to the summons.

Alexandratos, the Chief Officer, testified that there are two doors (hatch coverings) into the deep tank from the tween decks, each is about eight feet square, that they have coamings around them; that they do not have any railing around the opening; that the holds are not closed. His exact words are these—"We don't do it unless it is a very, very—a very, very urgent need, because the doors are metal doors and very heavy and involve too much work"—it is too difficult to close them— and that when the tween decks hatch is empty these steel doors or covers for the hatch are usually left open.

This is a case where the seaman in the performance of his duties was ordered into a place that was in an unsafe condition, in that the flooring over which he had to pass contained an open hatch, unprotected and unlighted. This presented a latent hazard and it was the duty of the respondent either to afford protection against the hazard or at least to give the libellant a proper warning that the hazard existed. The S. S. Anderson (Johnson's case), D.C., 37 F.Supp. 695. The dynamos of the ship were not operating. The only light in the fireroom was furnished by several of these hanging kerosene lamps. Libellant was denied even the aid of such a lamp when he attempted to take one to the coal bunker tween decks. He was told

64

that there was a lamp in the tween decks coal bunker. The light inside the tween decks coal bunker was totally inadequate. Libellant had never been there before. He did not know of the existence of the open hatch. The accident was a result of the respondent's negligence and was not contributed to by any negligence on the part of the libellant.

A long line of cases have recognized the obligation of a seaman to obey the orders of his superiors. He has not the same freedom of action as the average workman.

■ On the doctrine of the assumption of risks pleaded in this case, see Masjulis v. United States Shipping Board, 2 Cir., 31 F.2d 284; Reskin v. Minnesota-Atlantic Transit Co., 2 Cir., 107 F.2d 743. The tween decks bunker and the condition in which it was at the time libellant was sent there to work was not a reasonably safe place in which to work and this was known to the officers and engineers of the ship and those who were libellant's immediate superiors. Williams Steamship Corp. v. Parsons, affirmed 4 Cir., 96 F.2d 219.

■ On the question of libellant's damages and his injuries I have made the following findings:

"13. Libellant sustained several fractures of the left wrist; fracture of the pelvis, right side; fracture of the left hip; fracture of the right clavicle; synovitis of the left knee joint and synovitis of the left ankle joint—the latter two injuries were temporary in nature. The injury to the left wrist is permanent in nature. The permanent disability of this member amounts to about 45% of the entire left wrist and hand. This will hinder him in his work as a fireman or scaler, although he will be able to perform certain other types of work that do not require the full use of this member. The fractures of the pelvis and hip are permanent to some degree. They prevent him from going up and down stairs quickly, with the agile movements required of a seaman who works in a fireroom on ships. The right shoulder is permanently disabled although the functional impairment is not great. He cannot carry any heavy weight on his right shoulder. In view of his injuries as a whole, I find that he will not be able to perform the manual labor required of a coal passer or fireman. He will not be able to do heavy laborious work ashore, although he will be able to perform jobs of the nature of light duty, such as he has been doing for the past two years.

"14. Libellant was in the hospital from December 23rd, 1939 to March 18th, 1940. He used crutches for one month and a cane all summer. His hospital bill was very reasonable, only $366.50. So was his doctor's bill—$278.00.

"15. Libellant did no work for two years from December 23rd, 1939 to December of 1941. He has been working steadily since his return to work in the latter part of December 1941. For a short time he was a scaler and thereafter and. at the present time he is a fire watcher, i.e., a laborer who holds a fire extinguisher as a welder operates a torch. About the day of his injury, he was earning $4.00 to $6.-00 a day. Wages increased after that. He could have averaged at least $30.00 a week in wages during the two year period of his incapacity—$3,120.00. Proper compensation for his pain and suffering is fixed at $4,000.00. Libellant, at the present time, is forty years of age. He should have about twenty years of working life ahead of him. Compensation for his lost earning capacity due to his permanent injuries is fixed at $250.00 a year for a period of twenty years, a total of $5,000.00. Libellant is also entitled to maintenance at $15.00 a week for a period of one and three quarter years, from March 18th, 1940, when he left the hospital to the week before Christmas in December 1941, when he returned to work, a sum of $1,356.00. The various items of damage and maintenance total $14,120.50."

Let a decree be entered accordingly in favor of libellant against respondent, Andrew Bergoty, also known as Andreas Vergottis, in the sum of $14,120.50 and costs.